UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JOSHUA JOSEPH TACKETT,

        Petitioner,

                                     CASE NO. 12-15637
v.                                   HONORABLE DENISE PAGE HOOD

DEBRA SCUTT,

        Respondent.
_____/

## OPINION AND ORDER DENYING THE PETITION FOR WRIT OF HABEAS CORPUS AND GRANTING IN PART A CERTIFICATE OF APPEALABILITY

This matter is presently before the Court on petitioner Joshua Joseph Tackett's habeas corpus petition under 28 U.S.C. § 2254. The petition challenges Petitioner's Washtenaw County convictions for two counts of first-degree (premeditated) murder, Mich. Comp. Laws § 750.316(1)(a), and two counts of possessing a firearm during the commission of a felony ("felony firearm"), Mich. Comp. Laws § 750.227b. Petitioner is serving a life sentence for the murder convictions. He claims in his habeas petition that (1) the evidence was insufficient to support his murder convictions, (2) the trial court's jury instructions violated his constitutional rights, (3) the trial court violated his right to present a defense, (4) his rights to due process and equal protection of the law were violated because two

more culpable co-defendants were found guilty of the lesser offense of second-degree murder, (5) his trial attorney was ineffective, and (6) his attorney on direct appeal was ineffective. The State urges the Court to deny the petition. Because the Court agrees that Petitioner's claims do not warrant habeas relief, the denies the petition.

## I. BACKGROUND

Petitioner and his three co-defendants (Paul Copas, Tony Tard, and Sarah Sykes) were charged with two counts of open murder and two counts of felony firearm. The charges arose from a shooting at Clint Ousley's mobile home in Ypsilanti Township about 11:30 p.m. on July 9, 2006. The shooting resulted in the deaths of fourteen-year-old Krilissa Feldman and seventeen-year-old Scott Bonar.

Prior to the shooting, Copas, Tard, Sykes, and Krisann Elisson went to Ousley's home in Copas' van. Copas confronted Ousley outside Ousley's trailer and called Ousley a bitch; he also made a motion like he was cocking a gun. Ousley picked up a baseball bat and called for help from two of his friends who were inside his trailer. Ousley and his friends then argued with Copas and Tard for a few minutes. Copas and Tard retreated soon afterward and jumped back in their van. As they drove away, Ousley threw a crowbar into the rear side window of the

van and knocked out the window.  As written by the state court of appeals, later

that evening,

> [Tackett, Copas, and Tard left Copas'] house with two assault rifles,
> picked up codefendant Sykes and others, and traveled from Ecorse to
> Ousley's trailer home in Ypsilanti.  When they were near Ousley's
> trailer, codefendant Tard stopped at a gas station and covered the
> license plate, and defendant Tackett moved from the passenger seat to
> the rear of the van near the broken window.  Defendant Tackett put on
> gloves and supplied gloves or socks for the others.  Codefendant
> Sykes continued to the trailer park.  The van pulled over and waited
> until a patrol car left the area.  As they waited, codefendant Tard said,
> "let's shoot up the trailer," and defendant Tackett "[went] along with
> him."  After the patrol car left the area, the van continued to Ousley's
> trailer and the three men put on hooded sweatshirts.  There was
> evidence that defendant Tackett shot or attempted to shoot a handgun
> while his codefendants fired assault rifles into Ousley's trailer.  After
> the shooting, the group drove back to Ecorse where defendant Tackett
> attempted to hide the assault rifles in his father's garage.

*People v. Tackett*, No. 277549, 2008 WL 4149002, at *9 (Mich. Ct. App. Sept. 9,

2008).

The next day, Petitioner voluntarily reported to the police station, and when

an officer interviewed him, he initially told the officer that he was with his

girlfriend on the night of the shooting.  He later changed his story and said that he

was asked to go to the trailer park on the afternoon of the shooting, but that he

declined to go.  Petitioner went on to tell the officer that Copas later summoned

him to Copas' home, and when he got there, he saw Copas and Tard putting

ammunition in assault weapons. Petitioner also stated that, after observing Copas, Tard, and Sykes leave with the assault rifles, he went home.

Following an additional investigation, Petitioner and Copas were tried jointly, but before separate juries, in Washtenaw County Circuit Court. Two key witnesses were Krisann Ellison and Loni Shalton who were not charged with the crimes. Ms. Ellison went to Ousley's trailer in Copas' van on the afternoon of July 9, 2006, and at trial, she corroborated Ousley's testimony about the afternoon incident. She also explained what happened later that day when she, Petitioner, Copas, Tard, and others went to Ousley's trailer in Copas' van. During the nighttime incident, she initially did not see any weapons, but later she saw the men pull out three guns from under a mattress in the van and then go to the back of the van where they put bullets in the guns. She did not observe the actual shooting because she had her head down, but she could tell that the shooting came from the back window of the van.

On cross-examination, Ms. Ellison admitted that she did not mention Petitioner to the police during an interview and that she probably informed the police that she did not see who had the guns. She also admitted that she did not actually see Petitioner pull out a firearm or fire a gun, but she thought that the third firearm may have been small. She said that she was afraid of all the men and that,

after the shooting, either Petitioner or Copas threatened to do to her what the men had done to Ousley if she said anything about the incident.

Loni Shalton was present only during the nighttime incident. She testified that she saw two long guns in the van on the way to Ousley's trailer and that Copas had wanted to drive by the trailer park and shoot into the air. Tard later suggested shooting up the trailer, and they all agreed to that suggestion. After the group stopped at a gas station, the men got in the back of the van, and Sykes drove the van. She (Shalton) then saw three guns, one of which was a small handgun that Petitioner may have pulled out from somewhere on his clothes. Petitioner also pulled out gloves. He kept one for himself and handed the other gloves to Copas and Tard. After Tard said that he was going to shoot up the trailer, they arrived at the trailer. The men put on hooded sweatshirts and fired their guns out the broken window of the van. Then they returned to Ecorse where they handed their guns to a man who lived across the street from Petitioner's father.

On cross-examination, Ms. Shalton stated that she was not looking at who was shooting when the guns were fired. She also stated that Petitioner had said his gun jammed and did not fire. She was unable to say whether Petitioner discharged his weapon, and she denied hearing Petitioner make any threats. She was questioned about her testimony at the preliminary examination where she said that

she did not see Petitioner point a handgun at anybody outside the van. She then admitted that she did not see Petitioner shoot anybody.

Petitioner did not testify at trial, and his only witness was Steven Howard, who testified as an expert in firearms. Mr. Howard maintained that the lead core of the bullet fragment linked to the handgun supposedly used by Petitioner was badly oxidized, which meant that it was probably in a moist open-air environment for a considerable amount of time. His educated guess was that the bullet had been fired inside the home, because a bullet of that size has little energy.

Petitioner's defense was that there was no physical evidence connecting him to the crime, that Ms. Ellison and Ms. Shalton were inconsistent in their testimonies, and that he did not shoot anybody, intend to commit murder, or aid and abet anyone in committing the crimes. On January 26, 2007, both Petitioner and Copas were found guilty of two counts of first-degree, premeditated murder and two counts of felony firearm.[1]

---

[1] At some point, Tard and Sykes pleaded guilty to two counts of felony firearm and two counts of open murder, which encompasses first-degree and second-degree murder. *See People v. Johnson*, 427 Mich. 98, 107; 398 N.W.2d 219, 222 (1986) ("Neither statute nor case law requires specification of the degree of murder at a preliminary examination where open murder is charged in the information.")

The "open murder" statute, M.C.L. § 750.318, establishes a procedure for determining the degree of murder when the information does not charge the defendant with a specific degree of murder. When a person

Petitioner moved for a new trial and for a judgment notwithstanding the verdict ("JNOV"). Petitioner argued in his JNOV motion that there was insufficient evidence of premeditation and deliberation to substantiate a first-degree murder conviction. The trial court disagreed, noting

> that the defendants fired numerous times with weapons that included assault rifles directly into a house trailer from close range. And the evidence further indicated that they had planned this for some time, at least during the trip to Ypsilanti and as was testified to, there were discussions about what they were going to do during that time. . . .

(3/13/07 Sentencing Tr. at 10.) The trial court denied the JNOV motion after concluding that "the jury could well have found as they did, premeditation and deliberation." *Id.*

---

> charged with murder is convicted by a jury, M.C.L. § 750.318 requires the jury to "ascertain in their verdict, whether it be murder of the first or second degree." However, when a defendant is "convicted by confession," the court must "proceed by examination of witnesses to determine the degree of the crime" and "render judgment accordingly." *Id.; People v. Martin,* 316 Mich. 669, 671–672, 26 N.W.2d 558 (1947). The statute does not specify whether the defendant retains any constitutional rights regarding the hearing, but [the Michigan Court of Appeals has] held that the degree hearing following a guilty plea is not a trial, and a defendant who pleads guilty of open murder is no longer entitled to have a jury determine the degree of murder.

*People v. Watkins*, 247 Mich. App. 14, 20–21; 634 N.W.2d 370, 376 (2001) (end citations omitted). The trial judge who presided over Petitioner's trial held a "degree hearing" in Tard and Sykes' cases and found both of them guilty of second-degree murder, Mich. Comp. Laws § 750.317.

Petitioner's motion for new trial raised five issues regarding the violation of the trial court's discovery order, the sufficiency of the evidence, the alleged denial of the right to confront a witness, the autopsy photographs, and the alleged tainting of the jury pool. The trial court found no merit in those claims and denied Petitioner's motion for new trial. *Id*. at 10-12. The trial court then sentenced Petitioner to two concurrent terms of two years in prison for the felony-firearm convictions, followed by two concurrent terms of life imprisonment for the murder convictions. *Id*. at 28-29.

In an appeal as of right, Petitioner argued through counsel that: (1) there was insufficient evidence to support his murder convictions; (2) defense counsel was ineffective for failing to (a) elicit further evidence of an intent to destroy property, (b) object to improper evidence of propensity to commit crimes, and (c) request a specific jury unanimity instruction; (3) he was denied his constitutional right to a unanimous verdict; (4) the trial court deprived him of his right to due process and a fair trial by allowing a prosecution witness to testify, despite the late provision of discovery material; and (5) the improper admission of photographs deprived him of a fair trial. The Michigan Court of Appeals consolidated Petitioner's appeal with Copas' appeal and affirmed both defendants' convictions. *See People v. Tackett*, Nos. 277240, 277547, 2008 WL 4149002 (Mich. Ct. App.

Sept. 9, 2008).  Petitioner raised the same issues in the Michigan Supreme Court, which denied leave to appeal on January 21, 2009, because it was not persuaded to review the questions presented to it.  *See People v. Tackett*, 483 Mich. 878; 759 N.W.2d 207 (2009).

Petitioner subsequently filed a motion for relief from judgment in which he argued through his current attorney that:  (1) his murder convictions violated due process and equal protection of the law because two more culpable co-defendants were found guilty of second-degree murder; (2) his convictions violate substantive due process because elements of a statutorily defined offense were found not to exist as to two co-defendants; (3) the trial court's explanation of the distinction between first-degree and second-degree murder violated his right to due process because the instruction required the jury to reject manslaughter as a lesser offense before finding guilt on second-degree murder; (4) defense counsel was ineffective for failing to (a) recall and impeach Ousley, (b) object to the erroneous jury instructions, (c) move for an adjournment of the trial, and (d) impeach two prosecution witnesses; and (5) appellate counsel was ineffective for failing to raise the foregoing  issues on direct appeal.  The trial court rejected Petitioner's third and fourth claims about the jury instructions and trial counsel because Petitioner had not shown "good cause" under Michigan Court Rule 6.508(D)(3) for failing to

raise the issues on appeal and "actual prejudice." The trial court rejected Petitioner's claim about appellate counsel because Petitioner's underlying claims about the jury instructions and trial counsel lacked merit.

The trial court addressed the merits of Petitioner's first and second claims regarding the disparity in the judgments between the two sets of co-defendants. The trial court stated that it was unjust and a miscarriage of justice that Petitioner was convicted and sentenced for first-degree murder, whereas co-defendants Tard and Sykes were subsequently convicted and sentenced for second-degree murder, despite the lack of a factual difference in circumstances. The court, nevertheless, denied Petitioner's motion for relief from judgment because the court did not believe it had the power under state law to grant the requested relief. *See People v. Tackett*, No. 06-1194 FC (Washtenaw Cty. Cir. Ct. Nov. 5, 2010). Petitioner appealed the trial court's decision without success. Both the Michigan Court of Appeals and the Michigan Supreme Court denied leave to appeal for failure to establish entitlement to relief under Michigan Court Rule 6.508(D). *See People v. Tackett*, No. 305881 (Mich. Ct. App. July 13, 2012); *People v. Tackett*, 493 Mich. 897; 822 N.W.2d 774 (2012).

On December 22, 2012, Petitioner filed his habeas corpus petition. After the State filed an answer to the petition, Petitioner moved for a stay until Michigan's

appellate courts could decide in an unrelated case whether trial courts may correct unjust convictions and grant relief from judgment under Mich. Comp. Laws § 770.1. On August 29, 2013, the Court granted Petitioner's motion for a stay and closed this case for administrative purposes. *See* Order, Docket No. 17.

On May 24, 2016, Petitioner moved to lift the stay in this case on the basis that the authority of trial courts to correct injustice under § 770.1 was not likely to be resolved by the State's appellate courts in the near future. On September 28, 2016, the Court granted Petitioner's motion and re-opened this case. *See* Order, Docket No. 19.

As a preliminary matter, the Court addresses the State's contention that Petitioner procedurally defaulted his second claim regarding the jury instructions and portions of his fifth claim regarding trial counsel. Petitioner maintains that his appellate counsel's ineffectiveness excuses the alleged procedural defaults.

In the habeas context, a procedural default is "a critical failure to comply with state procedural law." *Trest v. Cain*, 522 U.S. 87, 89 (1997). A procedural default ordinarily is not a jurisdictional matter, *Johnson v. Lee*, 136 S. Ct. 1802, 1806 (2016) (citing *Trest*, 522 U.S. at 89), and " '[j]udicial economy might counsel' bypassing a procedural-default question if the merits 'were easily resolvable against the habeas petitioner.' " *Id.* (quoting *Lambrix v. Singletary*, 520

U.S. 518, 525 (1997)).  Petitioner's claims do not warrant habeas relief, and the Court finds it more efficient to address the substantive merits of the claims than to determine whether the claims are procedurally defaulted.  The Court, therefore, excuses the alleged procedural defaults in this case and proceeds to address Petitioner's claims on their merits.

## II.  STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") requires habeas petitioners who challenge "a matter 'adjudicated on the merits in State court' to show that the relevant state court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.' " *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) (quoting 28 U.S.C. § 2254(d)).  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000).  "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333, n. 7 (1997), and 'demands that state-court decisions be given the benefit of the

doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his or her claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id*. at 103. A state-court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. DISCUSSION

### A. Sufficiency of the Evidence

Petitioner begins by challenging the sufficiency of the evidence at his trial. He argues that the evidence failed to show he possessed the intent to kill, which is an element of first-degree murder. He contends that two factors point to the lack of premeditation: (1) evidence that the defendants acted recklessly, not deliberately,

and merely wanted to avenge property destruction (the breaking of the window in Tard's van) with property destruction (shooting up Ousley's trailer); and (2) evidence that Petitioner did not shoot either one of the victims. The Michigan Court of Appeals disagreed with Petitioner's argument and concluded that the evidence was sufficient to support his murder convictions.

### 1. Clearly Established Federal Law

The Due Process Clause of the United States Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). Following *Winship*, the critical inquiry on review of a challenge to the sufficiency of the evidence supporting a criminal conviction is

> whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.

*Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979) (internal citations and footnote omitted) (emphases in original).

Under AEDPA, the Court's "review of a state-court conviction for sufficiency of the evidence is very limited." *Thomas v. Stephenson*, 898 F.3d 693, 698 (6th Cir. 2018). "*Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference." *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (*per curiam*).

First, it is the responsibility of the jury to decide what conclusions should be drawn from the evidence admitted at trial. *Id*. (quoting *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (*per curiam*)). "And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" *Id*. (quoting *Cavazos*, 565 U.S. at 2); *see also Tanner v. Yukins*, 867 F.3d 661, 672 (6th Cir. 2017) (stating that "two layers of deference apply [to a sufficiency-of-the-evidence claim], one to the jury verdict, and one to the state appellate court"), *cert. denied*, 138 S. Ct. 1283 (2017).

> "[T]his standard is difficult to meet," no doubt, but "that is because it was meant to be." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). "[H]abeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. at 102-03 (internal quotation marks and citation omitted).

*Thomas*, 898 F.3d at 698.

The *Jackson* "standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. To establish first-degree premeditated murder in Michigan, "the prosecution must prove that the defendant intentionally killed the victim and [that] the act of killing was deliberate and premeditated." *People v. Haywood*, 209 Mich. App. 217, 229; 530 N.W.2d 497, 503 (1995). "To premeditate is to think about beforehand; to deliberate is to measure and evaluate the major facets of a choice or problem." *People v. Morrin*, 31 Mich. App. 301, 329; 187 N.W.2d 434, 449 (1971) (internal and end footnotes omitted). "[P]remeditation and deliberation may be inferred from all the facts and circumstances surrounding the incident, including the parties' prior relationship, the actions of the accused both before and after the crime, and the circumstances of the killing itself." *Haywood*, 209 Mich. App. at 229; 530 N.W.2d at 503 (internal and end citations omitted).

Petitioner was charged with committing murder or intentionally assisting someone else in committing the murder. Aiding and abetting is "any type of assistance given to the perpetrator of a crime by words or deeds that are intended to encourage, support, or incite the commission of that crime." *People v. Moore,* 470 Mich. 56, 63; 679 N.W.2d 41, 46 (2004).

> To show that an individual aided and abetted the commission of a crime, the prosecution must establish

> "that (1) the crime charged was committed by the defendant or some other person, (2) the defendant performed acts or gave encouragement that assisted the commission of the crime, and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time he gave aid and encouragement."

*People v. Henderson*, 306 Mich. App. 1, 10; 854 N.W.2d 234, 241 (2014) (quoting *People v. Carines,* 460 Mich. 750, 757-58; 597 N.W.2d 130, 135 (1999)). "Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to show that a person is an aider and abettor." *People v. Wilson*, 196 Mich. App. 604, 614; 493 N.W.2d 471, 476 (1992).

## 2. Application

As noted above, the evidence established that, on the night of the shooting, Petitioner, Copas, and Tard left Copas' home with two assault rifles. They picked up a few other individuals in Copas' van and headed toward Ousley's trailer park, which was located in a different city. Along the way, Petitioner, Copas, and Tard moved to the back of the van near the broken window. Petitioner pulled out a glove and gave a glove or sock to Copas and Tard. He also helped Copas and Tard put bullets in guns that they pulled out from under a mattress in the van. When the group arrived in Ousley's trailer park, they waited for a patrol car to pass by and then agreed to shoot up the trailer. Petitioner was observed with a handgun, and

the physical evidence indicated that assault rifles and possibly a handgun were fired at Ousley's trailer. After the shooting, the group returned to Ecorse where Petitioner assisted the group in disposing of the guns.

The Michigan Court of Appeals reasonably concluded from the evidence that "Tackett's conduct before, during, and after the incident was sufficient to enable the jury to find beyond a reasonable doubt that he was a willing participant in the commission of the crimes." *Tackett*, 2008 WL 4149002, at *9. The Court of Appeals pointed out that "the use of assault rifles supported an inference that defendant Tackett possessed an intent to kill, and the drive from Ecorse to Ypsilanti, along with the delay while waiting for a patrol car to leave the area immediately before the shooting, permitted an inference that the shooting was deliberate and premeditated." *Id.* The Michigan Court of Appeals also opined that the evidence and Petitioner's relationship with the co-defendants involved in the offense supported an inference that he agreed to participate in the crime.

Even if Petitioner did not cause the victims' deaths, a rational trier of fact could have concluded from the evidence that he assisted Copas and Tard in committing the murders. He armed himself with a gun and possessed gloves or socks, ostensibly to avoid leaving fingerprints on the guns. He also accompanied Copas and Tard to Ousley's trailer and agreed to the plan to shoot up the trailer.

18

The jury could have inferred from the fact that the group went to the home of Petitioner's father immediately after the shooting and then disposed of the guns nearby that Petitioner supplied the firearms used in the shooting. The jury also could have inferred that Petitioner intended to use the weapons to shoot and kill Ousley and his friends or that he knew Copas and Tard intended to kill the occupants of the trailer.

A rational juror could have concluded from the evidence taken in the light most favorable to the prosecution that the prosecution proved the elements of the crime beyond a reasonable doubt. The Court must defer to the jury's verdict and to the state court's conclusion that there was sufficient evidence of first-degree murder. Because both the jury's verdict and the state court's conclusion were objectively reasonable, Petitioner has no right to relief on the basis of his claim.

## B. The Jury Instructions

Petitioner argues next that the trial court's charge to the jury violated his rights to due process and a fair trial because the instructions failed to ensure that the jury properly applied the law to the facts. Petitioner alleges that (1) the instructions required the jury to reject manslaughter as a possible verdict before finding Petitioner guilty of murder and (2) the court failed to read an instruction on the necessity of a unanimous verdict as to distinct acts. The Michigan Court of

Appeals rejected the latter argument on direct appeal, and the state trial court rejected the former argument during post-conviction proceedings.

### 1. Clearly Established Law

Trial judges have a duty to give instructions that sufficiently explain the law, *Kelly v. South Carolina*, 534 U.S. 246, 256 (2002), but "not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation." *Middleton v. McNeil*, 541 U.S. 433, 437 (2004). The only question on habeas review of a jury instruction is whether the ailing instruction infected the entire trial, such that the resulting conviction violates due process. *Estelle v. McGuire*, 502 U.S. 62, 72 (1991) (citing *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

A reviewing court must judge the disputed instruction in the context of the trial record and the instructions as a whole. *Id.* So, "[t]o warrant habeas relief, 'jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair.'" *Buell v. Mitchell*, 274 F.3d 337, 355 (6th Cir. 2001) (quoting *Scott v. Mitchell*, 209 F.3d 854, 882 (6th Cir. 2000)). In making that determination, the Court must bear in mind that the Supreme Court has defined the category of infractions that violate fundamental fairness very narrowly. *McGuire*, 502 U.S. at 72-73.

## 2. Mitigation to Manslaughter

The trial court initially instructed the jury that, to convict Petitioner of first-degree, premeditated murder, the jury had to find beyond a reasonable doubt that:

> First[,] the defendant caused the death of Krilissa Feldman as to count one and to Scott Bonar as to count two. Second, that the defendant intended to kill Krilissa Feldman as to count one and Scott Bonar as to count two. Third, that this intent to kill was premeditated, that is thought out beforehand. And fourth, that the killing was deliberate which means that defendant considered the pros and cons of the killing, and thought about and chose his actions before he did it. . . .
>
> And fifth, that the killing was not justified, excused, or done under circumstances that reduce it to a lesser crime.

(1/25/07 Trial Tr. at 235.)

The court went on to explain that the jury could also consider the lesser charge of second-degree murder. When the court subsequently summarized the difference between second-degree and first-degree murder, the trial court said:

> First degree, premeditated murder requires the victim's death, that the death was caused by the defendant, that the death was not justified or excused *or mitigated to manslaughter*, and fourth that the defendant actually intended to kill the victim and the defendant premeditated the victim's death, and that the defendant deliberated the victim's death.

*Id*. at 236 (emphasis added).

Petitioner contends that the language "mitigated to manslaughter" in the instruction quoted above was incorrect because mitigation to manslaughter is not a prerequisite to defeating the crime of first-degree murder. Petitioner also contends

that it is possible the jury never considered second-degree murder because, according to him, the trial court instructed the jurors that they should first consider the primary offense, and if they agreed on the primary offense, they did not have to consider the lesser offense.

Petitioner's claim lacks merit because "the fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *McGuire*, 502 U.S. at 71-72. The alleged error also did not render the trial fundamentally unfair or deprive Petitioner of due process because the disputed instruction did not permit the jury to convict Petitioner of first-degree murder on less evidence than was necessary. Also, contrary to Petitioner's allegation, the trial court did *not* instruct the jurors on the order of deliberations, nor tell the jurors that they could avoid considering lesser offenses if they agreed Petitioner was guilty of first-degree murder. The trial court made it very clear that the jurors could find Petitioner guilty of second-degree murder or voluntary manslaughter, and the court explained the elements of those offenses. (1/25/07 Trial Tr. at 235-38, 244.) The instructions, as a whole, did not deprive Petitioner of a fair trial.

### 3. Unanimity

Petitioner's second claim about the jury instructions is that the jurors were not told that they had to agree on specific theory, namely, whether Petitioner was a

principal in the crime and actually shot the victims or whether he aided and abetted the shooting. The Michigan Court of Appeals rejected this claim on direct appeal because Petitioner waived review of the claim by affirmatively approving the trial court's instructions.

The claim also lacks merit because the trial court did instruct the jurors that their verdict had to be unanimous, *see id.* at 242, and the Supreme Court has never suggested that in returning general verdicts, jurors must agree on a single means of commission. *Schad v. Arizona*, 501 U.S. 624, 631 (1991). As explained in *McKoy v. North Carolina*, 494 U.S. 433 (1990),

> Juries are typically called upon to render unanimous verdicts on the ultimate issues of a given case. But it is understood that different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.

*Id.* at 449 (Blackmun, J., concurring) (footnote omitted).

Simply stated, "juries are not required to agree on the theory of guilt." *Rogers v. Howe*, 64 F. App'x 450, 454 (6th Cir. 2003). "[I]t is acceptable for a first-degree murder conviction to be based on two alternative theories even if there is no basis to conclude which one (if only one) the jury used." *Coe v. Bell*, 161 F.3d 320, 348 (6th Cir. 1998) (citing *Schad*, 501 U.S. at 636-37). To conclude, Petitioner's claim lacks merit, as "there is no Supreme Court precedent holding

that a jury must agree on the factual issues underlying the verdict." *Rodriquez v. Jones*, 625 F. Supp.2d 552, 569 (E.D. Mich. 2009).

## C. The Right to Present a Defense

Petitioner asserts that the state trial court violated his right to due process and to present a defense by reversing its ruling on a discovery issue and then allowing a prosecution witness to testify despite the prosecution's late provision of discovery materials. The discovery evidence in question was a ballistics report prepared by an expert witness from the Michigan State Police. Petitioner points out that, at a motion hearing on December 5, 2006, defense counsel requested discovery, and the trial court ordered the prosecution to produce the ballistics report no later than January 9, 2007. The court also threatened to exclude discovery material if the prosecution did not meet the extended deadline. (12/5/06 Mot. Hr'g Tr. at 5.)

On Tuesday, January 9, 2007, the trial court extended the deadline to no later than Friday, January 12, 2007. The court once again threatened to exclude any exhibits not exchanged by the deadline. (1/9/07 Mot. Hr'g at 6-7.)

The ballistics report was finally provided to the parties on January 19, 2007, which was only three days before the start of Petitioner's trial. (1/24/07 Trial Tr. at 79-80). Despite the late delivery of the report, the prosecution's expert witness,

Detective Sergeant Jeffrey Amley, was permitted to testify that a .25 caliber bullet recovered from a heating duct in Ousley's trailer could have been fired from a handgun. *Id*. at 71.

According to Petitioner, the late submission of the ballistics report prevented his expert witness from performing a test that would have rebutted Detective Sergeant Amley's conclusion that white material on the small caliber bullet was drywall, not the result of oxidation. Test results showing the presence of oxidation on the bullet would have supported Petitioner's theory that the bullet was shot into the trailer long before the fatal shootings for which Petitioner was on trial. The Michigan Court of Appeals, nevertheless, determined on review of Petitioner's claim that the trial court did not abuse its discretion by admitting the untimely ballistics report and by allowing the prosecution's expert witness to testify.

Defendants in criminal prosecutions are entitled to "a meaningful opportunity to present a complete defense." *California v. Trombetta*, 467 U.S. 479, 485 (1984). But "[t]here is no general constitutional right to discovery in a criminal case," *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977), and the contention that the prosecutor violated a discovery order is not a cognizable claim on habeas corpus review because it involves an issue of state law. *Colston v.*

*Burke*, 37 F. App'x 122, 125 (6th Cir. 2002); *King v. Trippett*, 27 F. App'x 506, 508 (6th Cir. 2001).

The record, moreover, indicates that the prosecution did not act in bad faith when it failed to comply with trial court's order for discovery. Detective Sergeant Amley explained that the delay in submitting his report was due to his having to wait for evidence from the latent print unit at the Michigan State Police and because he sent some evidence to the DNA unit for possible examination. (1/24/07 Trial Tr. at 79-80, 104.)

The record also demonstrates that Petitioner had an adequate opportunity to rebut Detective Sergeant Amley's conclusions. On cross-examination of Amley, defense counsel elicited testimony that it was possible the small-caliber bullet fragment was very old. Counsel also elicited Amley's testimony that he did not perform a chemical test on the bullet fragment to determine whether the white substance on the fragment was drywall or oxidation and that it was possible the white substance was the result of oxidation. *Id.* at 88-93, 124, 131.

Petitioner was able to rebut Amley's testimony and defend himself in an additional manner: he produced his own expert witness. Although the defense expert witness did not have sufficient time to perform a microscopic test on the bullet fragment in question, *see* 1/25/07 Trial Tr. at 151, he opined that the white

material on the fragment was the result of oxidation.  *Id*. at 150.  As explained by the Michigan Court of Appeals, the defense expert

> was able to ascertain from examining the .25-caliber bullet that it was fired "[m]onths and months, if not years," before it was collected as evidence.  He had no hesitation about the bullet's age and explained that the difference between the recovered bullet and a recently fired bulled was like "the difference between day and night."  He also opined that a .25-caliber bullet did not have the velocity to enter the heater duct if shot from outside the trailer.

*Tackett*, 2008 WL 4149002, at *11.

The Michigan Court of Appeals concluded that, "[t]hrough this testimony, defendant Tackett plainly was able to present his defense that the .25-caliber bullet derived from a prior incident."  *Id*.  This Court agrees and concludes that the alleged violation of the trial court's discovery order did not violate Petitioner's constitutional right to present a defense.

## D.  The Disparate Treatment

Petitioner's fourth claim concerns the disparity between his convictions and sentence and the convictions and sentence of Tard and Sykes.  All four defendants (Petitioner, Copas, Tard, and Sykes) were charged with open murder, but Petitioner and Copas were found guilty of first-degree murder following a jury trial, whereas the same circuit court judge who presided over their trial determined that Tard and Sykes were guilty of second-degree murder.  Petitioner maintains that to convict

him of a more serious offense and to punish him with a harsher sentence than his co-defendants for the same actions and under the same legal theory and set of facts is legally indefensible and a violation of his right to due process and equal protection of the laws.[2]

The problem with Petitioner's argument is that "[i]nconsistency in a verdict is not a sufficient reason for setting it aside." *Harris v. Rivera*, 454 U.S. 339, 345 (1981); *accord United States v. Powell*, 469 U.S. 57, 69 (1984) (concluding that there was no reason to vacate the defendant's conviction merely because the verdicts could not rationally be reconciled); *Dunn v. United States*, 284 U.S. 390, 393 (1932) (stating that "[c]onsistency in the verdict is not necessary.") The evidence in Petitioner's case was sufficient to support the jury's conclusion that he was guilty of first-degree murder, and the Constitution did not prohibit the trial court from being lenient in Tard and Sykes' case. *Rivera*, 454 U.S. at 348.

Petitioner relies on *Griffith v. Kentucky*, 479 U.S. 314, 323 (1987), for the principle that similarly situated defendants must be treated the same. The issue in *Giffith*, however, was whether the Supreme Court's decision in *Batson v. Kentucky*,

---

[2] First-degree premeditated murder carries a mandatory penalty of life imprisonment without the possibility of parole, Mich. Comp. Laws § 750.316(1)(a), but "[s]econd-degree murder is punishable by imprisonment for *any term of years* or life, *with* the possibility of parole." *People v. Wesley*, 421 Mich. 375, 412; 365 N.W.2d 692, 709 (1984) (emphases in original).

476 U.S. 79 (1986), applied to cases "pending on direct state or federal review or not yet final when *Batson* was decided." *Id.* at 316. The Supreme Court did not address the issue of inconsistent verdicts.

Petitioner also relies on *Bunker v. Jabe*, 995 F.2d 1066, 1993 WL 206533(6th Cir. 1993), a *per curiam* decision in which the Sixth Circuit granted habeas relief because it had previously granted relief to the petitioner's co-defendant on the basis of an unconstitutional jury instruction. Bunker's appeal presented the Sixth Circuit "with the idiosyncratic situation in which the timing of a case announcing a new rule of retroactivity threaten[ed] to subject two codefendants in a case arising from the same facts to different legal standards." *Id.*, 1993 WL 206533 at *1. According to the Sixth Circuit, the principle that like cases be treated alike fell "within the spirit, if not the letter, of the law of the case doctrine, one example of which is the influence of a prior ruling 'of the same court . . . acting within the framework of single case or closely related cases.' " *Id.*, at *2 (quoting 18 Charles A. Wright, *et al.*, Federal Practice and Procedure § 4478 (1981)). The Sixth Circuit stated that it felt "constrained on this record to hold that the jury instruction in [Booker's] case be viewed as it was in [his co-defendant's] case." *Id.* The Sixth Circuit reversed the District Court's denial of the writ and remanded the case to the District Court with instructions to issue a writ of habeas

corpus, directing the State of Michigan to discharge Bunker or to give him a new trial.

*Bunker* is a circuit court case that was decided before AEDPA was enacted. Under AEDPA, this Court may grant habeas relief only if the state court's decision was contrary to, or an unreasonable application of, Supreme Court precedent, 28 U.S.C. § 2254(d)(1), and, as pointed out above, the Supreme Court has not held that inconsistent verdicts are a basis for granting habeas relief.

*Bunker*, moreover, is distinguishable because the two co-defendants in that case were tried jointly before the same jury. Petitioner was not tried with Tard or Sykes, and even assuming that his convictions and sentence were inconsistent with their convictions and sentence, this does not mean that the jury did not think he was guilty of first-degree murder or that he lacked the specific intent to kill the victims. "*Powell* teaches that the inconsistent verdicts are viewed completely separately, and that no conclusion may be drawn from comparing the two." *Mapes v. Coyle*, 171 F.3d 408, 420 (6th Cir. 1999). With a few exceptions not relevant here, "once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment." *Powell*, 469 U.S. at 67. "While symmetry of results may be intellectually satisfying, it is not required." *Standefer v. United States*, 447 U.S. 10, 25 (1980). The Court concludes that

Petitioner's claim "is not a proper ground for habeas relief because inconsistent verdicts do not require reversal of a conviction." *Grace v. Gidley*, No. 17-1840, 2018 WL 3583182, at *2 (6th Cir. Feb. 12, 2018) (unpublished).

## E. Trial Counsel

Petitioner claims that his trial attorney's acts and omissions violated his constitutional right to effective assistance of counsel. Petitioner raised his first four claims about trial counsel during post-conviction proceedings. The state trial court rejected the claims on state collateral review because Petitioner had failed to show "good cause" for not raising the claims on direct appeal and "actual prejudice" as a result of the alleged irregularities. The trial court also found no merit in the claims. The Michigan Court of Appeals adjudicated Petitioner's fifth and sixth claims about trial counsel on the merits during the direct appeal and concluded that trial counsel was not ineffective.

To succeed on his claims here, Petitioner must show "that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The deficient-performance prong "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth

Amendment." *Id*. Petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id*. at 688.

The "prejudice" prong "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id*. at 687. A defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105 (internal and end citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

### 1. Failure to Recall and Impeach Ousley

Petitioner alleges that Clint Ousley is a child rapist, thief, and drug addict and that his trial attorney should have brought these matters to the attention of the jurors so that they could assess Ousley's credibility as to how many gunshots and guns he heard during the shooting and whether his home had previously been shot

up. Petitioner asserts that these facts were critical to his defense that the small bullet found in Ousley's residence was there before the night in question.

Petitioner also contends that Ousley must have known of an unrelated warrant for criminal sexual conduct before he testified at Petitioner's trial because his alleged victim reported the sexual assault two months before Petitioner's trial. As additional support for the contention that Ousley was aware of pending charges against him before Petitioner's trial, Petitioner contends that Ousley was able to acquire a significant bond rather quickly after he was arrested, and he was docile at Petitioner's trial, but arrogant at Petitioner's preliminary examination.

The record confirms that Ousley was arrested on a warrant for criminal sexual conduct after he testified at Petitioner's trial. (1/24/07 Trial Tr. at 5-6.) But, as the Michigan Court of Appeals noted when co-defendant Copas raised this issue on direct appeal, there is no

> support for his claim that Ousley was aware of the unrelated warrant before he testified in this case, let alone that there was any arrangement whereby Ousley would receive leniency in that case in exchange for his testimony in this case. The mere fact that Ousley's preliminary examination may have differed in some respects from his trial testimony does not support such an inference. Rather, the inconsistencies presented defense counsel with an opportunity to impeach Ousley, which he did. Defendant has failed to show that defense counsel's performance with respect to Ousley fell below an objective standard of reasonableness.

In addition, the principal evidence implicating defendants Copas and Tackett at trial came from two eyewitnesses who were in the van with the defendants during the shooting.

*Tackett*, 2008 WL 4149002, at *3.

The Michigan Court of Appeals concluded that, because Ousley did not provide critical evidence implicating Copas, there was no reasonable probability that further impeachment of Ousley would have changed the jury's verdict. The same is true of Petitioner's case. Ousley testified that he did not see Petitioner during the incident with Copas on the afternoon of the shootings and that he had no conflicts with him. (1/23/07 Trial Tr. at 34-35.) He claimed that, even though he may have heard two assault rifles, he did not see who was shooting the guns. *Id*. at 40-42.

Ousley also admitted that he was the oldest person in the trailer during the shooting, that some people were smoking marijuana at the time, and that even though he was only eighteen years old, he had impregnated Sykes and had a son by another woman. *Id*. at 47-51. Given this unfavorable picture of Ousley and the fact that he did not implicate Petitioner in the shootings, there is not a reasonable probability that the outcome of the trial would have been different if defense counsel had recalled Ousley and attempted to impeach Ousley with his arrest for criminal sexual conduct or his involvement in any other criminal activity.

Petitioner has failed to show that counsel's allegedly deficient performance prejudiced the defense.

### 2. Failure to Object to the Jury Instructions

Petitioner contends that trial counsel should have objected to the erroneous jury instructions on unanimity and intent to commit murder. The trial court's summary of the elements of first-degree murder did not violate Petitioner's right to due process, *see supra*, section II.B.2, and in Michigan, trial courts are not required to instruct juries that they must agree unanimously on whether the defendant committed the crime as a principal or as an aider and abettor if there was sufficient evidence to support both theories of guilt. *People v. Smielewski*, 235 Mich. App. 196, 208-09; 596 N.W.2d 636, 642 (1999). There was sufficient evidence that Petitioner committed first-degree murder either as a principal or as an aider and abettor, and an objection to the instruction on unanimity would have lacked merit. "Omitting meritless arguments is neither professionally unreasonable nor prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013).

### 3. Failure to Move for an Adjournment

Petitioner maintains that his trial attorney should have moved to adjourn the trial when his expert witness testified that, if the prosecutor gave him enough time, he could prove that the small bullet in evidence was oxidized and had been fired

long before the night in question. The prosecution's expert witness, however, conceded that it was possible the white substance on the bullet was the result of oxidation and not drywall.

The defense expert witness, moreover, testified that the bullet was old and that it did not have sufficient velocity to penetrate the trailer and enter the heating duct where it was found. The defense witness's testimony was sufficient to establish Petitioner's defense that the .25-caliber bullet was fired during a previous incident. Defense counsel, therefore, was not ineffective for failing to request an adjournment of the trial so that his witness could perform a chemical test to prove that the white substance on the bullet was the result of oxidation and not drywall.

It is also unlikely that the trial court would have granted an adjournment midway through trial if defense counsel had requested an adjournment. The trial court indicated at the pretrial motion hearing on January 9, 2007, that it did not intend to adjourn the trial at the last minute as a result of failed discovery. (1/9/07 Mot. Hr'g at 7.) In light of this remark, a request for an adjournment mid-trial would have been futile. Trial counsel was not ineffective for failing to make the request. *See Altman v. Winn*, 644 F. App'x 637, 644 (6th Cir.) (stating that "the failure to make futile objections does not constitute ineffective assistance"), *cert. denied sub nom. Altman v. Brewer*, 137 S. Ct. 76 (2016).

### 4. Failure to Impeach Two Witnesses

Petitioner asserts that trial counsel should have questioned prosecution witnesses Frederick Steglich and Pete Wisniewski about their use of drugs and rum on the night in question. According to Petitioner, this information might have lead the jury to question the witnesses' ability to recall the events at Ousley's trailer.

Steglich testified on cross-examination by Petitioner's attorney that he had never seen or heard of Petitioner before the preliminary examination. (1/23/07 Trial Tr. at 162-63.) Wisniewski also testified on cross-examination by defense counsel that he did not see Petitioner on July 9, 2006, and did not know him or remember his face. *Id*. at 177-78. Wisniewski further admitted that he had been drunk and did not remember much from that day. *Id*. at 176. Because neither man implicated Petitioner in the crime and because one of them admitted to being drunk on the day in question, defense counsel's failure to cross-examine the men about their use of drugs and alcohol did not amount to ineffective assistance.

### 5. Failure to Elicit Further Evidence of Intent to Destroy Property

Petitioner asserts that intent was the core issue in his case and that defense counsel should have elicited additional testimony from Deputy Sheriff Lisa Farst and from Detective Sergeant Jeffrey Amley to establish that the defendants merely intended to destroy the trailer. Petitioner contends that effective cross examination

would have revealed, as it did at Tard and Sykes' degree hearing, that only Ousley was present outside the trailer, that the window shades to the trailer were closed, that the people inside the trailer were quiet and not visible from the outside, and that many of the bullets traveled at an upward trajectory.

Most of this evidence was elicited at Petitioner's trial. As the Michigan Court of Appeals explained on direct appeal when Copas raised the same issue,

> [t]he record discloses that defense counsel questioned Deputy Farst about her observations at Ousley's trailer. Farst testified that she went to Ousley's trailer at approximately 11:00 p.m. because of a noise complaint. Farst described what she observed when she arrived, including that "[t]he lights were on inside the trailer," "[n]o one was outside or around" and, as she pulled up, Ousley "came out." She further testified that she saw nothing unusual at the trailer, saw no other individuals other than Ousley, and did not recall if there were any vehicles parked outside. In addition, the jury saw a video recording made from the deputy's patrol car showing the conditions at the trailer five minutes before the shooting. In addition, evidence that the blinds were closed at the time of the shooting was presented through the ballistics expert, and no one disputed that the blinds were closed. Although Farst did not testify using the precise words she allegedly used at the degree hearing for codefendants Tard and Sykes, her observations were presented to the jury. Thus, there is no basis for concluding that defense counsel was ineffective for not further questioning Farst about her observations, or that his failure to do so was prejudicial.

> Likewise, defendant Copas has not established that defense counsel's questioning of Detective Amley denied him a substantial defense. Defendant Copas's suggestion that further questioning would have established that the bullets were fired at an upward trajectory and in a manner intended to miss people is not supported by the record. First, defendant Copas ignores that two individuals inside the trailer were

shot and killed by bullets fired from the van, thereby establishing that the bullets traveled at a trajectory suitable to strike people inside the trailer. Second, at least 15 bullets were fired along the front of the trailer and were concentrated in the area of the bay window, which was the area of illumination. Third, two assault rifles were used during the episode. Furthermore, as plaintiff points out, although the ballistics report showed that numerous bullets traveled through the trailer in an upward trajectory, it also revealed that bullets traveled within normal height ranges to strike individuals. In light of this evidence, there is no reasonable probability that further questioning on this subject would have affected the jury's verdict.

*Tackett*, 2008 WL 4149002, at *2-*3 (end citation and footnote omitted).[3]

These same facts apply to Petitioner's case, and for the reasons given by the Michigan Court of Appeals, counsel's cross-examinations of Deputy Fast and Detective Sergeant Amley did not fall below an objective standard of reasonableness. Any deficiencies in defense counsel's cross-examinations of Deputy Fast and Detective Sergeant Amley also did not prejudice Petitioner because Loni Shalton indirectly supported the defense theory on intent by testifying that the group had agreed to shoot up the trailer. (1/25/07 Trial Tr. at 67.) Trial counsel was not constitutionally ineffective for failing to elicit additional evidence of intent to destroy property.

### 6. Failure to Object to Testimony about a Warrant

---

[3] The Michigan Court of Appeals stated that its analysis of Copas's claim was equally applicable to Petitioner's claim and that Petitioner was not denied the effective assistance of counsel. *Tackett*, 2008 WL 4149002, at *10.

Petitioner's final claim about trial counsel is that counsel did not object to irrelevant and prejudicial evidence that he had an outstanding warrant in Washtenaw County. Evidence of the outstanding warrant came to light when the prosecutor asked an officer about the circumstances of his contact with Petitioner on July 10, 2006. The officer stated that Petitioner voluntarily reported to the police at the Ecorse Police Department and was then taken into custody and escorted to the Washtenaw County Sheriff's Department because he had an outstanding warrant and was wanted for questioning regarding the shootings. (1/23/07 Trial Tr. at 96-97.)

The reference to the warrant was a fleeting comment in a long trial, and the basis for the warrant was never disclosed to the jury. Because objecting to the comment would have drawn more attention to it, defense counsel was not ineffective for failing to object to the testimony. A strategic decision not to object to testimony for fear of focusing undue attention on damaging remarks is reasonable. *Cobb v. Perini*, 832 F .2d 342, 347-48 (6th Cir. 1987).

## F. Appellate Counsel

In his sixth and final claim, Petitioner alleges that his appellate attorney was ineffective on direct appeal. Petitioner contends that his appellate attorney should have raised his sufficiency-of-the-evidence claim on appeal in the same manner as

Petitioner presented it in his habeas petition by referring to the transcripts for Tard and Sykes' degree-hearing. Petitioner also contends that appellate counsel should have raised his first four claims about trial counsel and one of his claims about the jury instructions on direct appeal. According to Petitioner, appellate counsel's ineffectiveness justifies reinstatement of the appeal of right and also excuses any procedural defaults stemming from ineffective representation.

An appellate attorney is not required to raise every non-frivolous claim suggested by his or her client on direct appeal if counsel decides, as a matter of professional judgment, not to raise the claim. *Jones v. Barnes*, 463 U.S. 745, 751 (1983). "In fact, the process of winnowing out weaker arguments on appeal is the hallmark of effective appellate advocacy." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quotation marks and citations omitted). To prevail on his claim about appellate counsel, Petitioner must demonstrate (1) that his appellate attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability the defendant would have prevailed on appeal if his attorney had raised the issues. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Strickland*, 466 U.S. at 687-91, 694).

The arguments that appellate counsel did not make on direct appeal lack merit for the reasons given in the discussion above. "[B]y definition, appellate

counsel cannot be ineffective for a failure to raise an issue that lacks merit." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001). The trial court, moreover, concluded on state collateral review that appellate counsel was not ineffective for failing to raise certain issues. This conclusion is objectively reasonable and entitled to deference on habeas review. The Court, therefore, concludes that Petitioner's claim about appellate counsel does not warrant habeas relief.

## IV.  CONCLUSION AND ORDER

The state courts' adjudication of Petitioner's claims on the merits did not result in decisions that were contrary to Supreme Court precedent, an unreasonable application of Supreme Court precedent, or an unreasonable determination of the facts. The state-court decisions also were not so lacking in justification that there was an error beyond any possibility for fairminded disagreement. As for the claims that were not adjudicated on the merits, Petitioner has failed to show that he is in custody in violation of his constitutional rights. The Court, therefore, denies the petition for a writ of habeas corpus.

Before Petitioner may appeal the Court's decision, a certificate of appealability must issue. See 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b)(1). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."   28 U.S.C. §

2253(c)(2). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

Reasonable jurists could conclude that Petitioner's first, fourth, and sixth claims regarding the sufficiency of the evidence, the disparate verdict in Tard and Sykes' case, and appellate counsel deserve encouragement to proceed further. The Court, therefore, grants a certificate of appealability on those issues. The Court declines to grant a certificate of appealability on claims two, three, and five regarding the jury instructions, the discovery dispute, and trial counsel, because reasonable jurists could not disagree with the Court's resolution of those claims. Nor could they conclude that those issues deserve encouragement to proceed further.

s/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: November 29, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on November 29, 2018, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager